## Low *plff. in equity, vs.* Treadwell.

Courts of equity will decree specific performance of a contract for the convey-ance of land, though the party seeking it may not in every respect have strictly performed his part of the agreement, if no *laches* are imputable to him.

Though the Court will not lend its aid to enforce a hard, unreasonable and une-qual contract, yet the enhancement or depreciation of the value of property by events subsequent to the making of a contract for the conveyance of land, will not be regarded by the Court, if such contract be fairly entered into at the time.

The maker of a note may prove by *parol,* that the payee, subsequent to the making of the note, agreed that payment might be made to a third person.

This was a *bill in equity* in which the plaintiff sought the specific performance of a contract for the conveyance of land. The facts, and points made by counsel, are sufficiently stated in the opinion of the Court, which was delivered by

Parris J. — The complainant sets forth in his bill, that on the 27th of *March,* 1832, he entered into a contract in writing under seal, with the respondent, whereby the respondent covenanted and agreed, that upon the payment to him, by the said *Low,* of forty-three thousand of good bricks, in said *Low's* yard in *Bangor,* twenty thousand of which to be delivered by the first day of *August* then next, and twenty-three thousand on the sixth of *October,* 1833, he, the said *Treadwell,* would, by a good and sufficient deed of bargain and sale and of warranty, convey to the complainant a piece of land in *Bangor,* being the north part of lot numbered 221, as delineated on *Treat's* plan, particularly describing a tract 247 feet long and 157 feet wide, and also an easement for a passage way from the south end of said tract over the east side of said *Treadwell's* land to Garland street, which contract, under the hands and seals of the parties, as particularly set forth at large in the complainant's bill. It is further alleged in the bill, that the complainant on the same twenty-seventh of *March,* when the said agreement was completed, made and de-livered to the respondent two notes of hand, promising to pay him the two quantities of bricks mentioned in said written agree-ment, at the time, place and manner therein mentioned, and that,

at the time of signing said notes the said *Treadwell* represented that he owed *Joshua W. Carr*, of *Bangor*, twenty thousand of bricks that would be due and payable on the same first day of *August*, when the complainant's note for the same quantity of bricks would become due and payable to said *Treadwell*, and that the bricks to be delivered by the complainant to *Treadwell*, were intended for *Carr* in fulfillment of *Treadwell's* obligation to him. — It is further alleged, that *after* making the note and before the same became payable, *Treadwell* informed the complainant that if he would, in any way, satisfy *Carr* for the twenty thousand of bricks payable to him as aforesaid, so that said *Carr* would not call upon *Treadwell* for payment, it should be considered and accepted as payment to him ; — and that, thereupon, in pursuance of *Treadwell's* representation and engagement, the complainant on the 28th of *July*, 1832, made an arrangement with *Carr* to postpone the payment of the twenty thousand of bricks for a few days, stipulating to make *Carr* a suitable compensation for the delay and injury he might sustain thereby ; — and that on the sixteenth of the same *August*, the complainant paid and delivered to said *Carr*, and he accepted and received said twenty thousand of bricks, in full payment and satisfaction of his claim against *Treadwell* for the like quantity ; — and that said *Carr* also accepted and received from the complainant an additional quantity of five hundred bricks for the delay of payment as above stated.

In this manner, *Low* claims to have satisfied and discharged his contract with *Treadwell*, so far as regards the twenty thousand of bricks, by the original agreement to be paid by the first of *August*. The complainant further states in his bill, that on the fifth day of *October*, 1833, he was ready with said twenty-three thousand of good bricks in his yard in *Bangor*, and then and there counted out and tendered the same bricks to said *Treadwell*, and gave notice to him in writing, early in the morning of said fifth of *October*, the sixth being the sabbath, that said bricks were ready to be delivered to him in payment of said note and in full satisfaction of the quantity mentioned in the written agreement. The bill alleges that *Treadwell* refuses to execute the

contract on his part, and prays for a conveyance and general relief.

The respondent, in his answer, admits the written agreement or contract as set forth in the bill, saving an error in the width of the lot, which he alleges should be one hundred and fifty-*three* feet, and so appears by the plan, and not one hundred and fifty-*seven* feet : and that the error was made by the complainant by whom the agreement was written.

He admits that he was to pay *Carr* twenty thousand of bricks on the first of *August*, 1832, alleges that he demanded the twenty thousand of bricks of the complainant on the first of *August*, who did not deliver them, and denies that he ever consented to have *Low* pay *Carr* twenty thousand of bricks for him, or had any notice, until between the middle and end of *August*, that *Low* thought to pay *Carr*, or he to receive of *Low*, any bricks on account of *Low's* note to the respondent. He does not deny a tender of the twenty-three thousand of bricks on the fifth of *October*, but denies notice of it, and admits a demand on him by the complainant for a deed, and his refusal.

The answer contains much other matter not called for by the bill, and consequently irrelevant. The general replication having been filed, our attention has been called to the proof in the case. There is no other controversy between the parties concerning the written agreement of the 27th of *March*, than the alleged error in the description of the length of the end lines of the piece of land, which constituted the subject of the contract. The agreement itself refers to *Treat's* plan of the 30th of *September*, 1830, and the respondent asserts, in his answer, that, by this plan, the northwardly and southwardly end lines of the lot are only one hundred and fifty-*three* feet in length. If it so appeared on the plan we should certainly consider the error as proved, and cause it to be corrected. But *Davis*, the Register of Deeds, testifies that the plan is recorded in his office, and that the lot about which these parties are contending is represented thereon as one hundred and fifty-*seven* feet by four hundred and twenty-five feet. In addition to this, we have before us the original plan itself, which coincides with *Davis's* testimony. We must, therefore, on this point, consider the answer as overcome by other proof, and

that there is no mistake in the description of the premises calling for our correction.

It is admitted in the bill that the twenty thousand of bricks were not actually delivered on the first of *August*, but the complainant sets forth, what he contends is a sufficient excuse for not doing it. He avers that he was authorized by *Treadwell*, to make payment to *Carr*, and that he was assured by *Treadwell* that if he, *Low*, would, in any way, satisfy *Carr*, so that he would not call on *Treadwell* for payment, it should be considered as payment of the note from *Low* to *Treadwell*, and that, in pursuance of this understanding he did pay *Carr* to his entire satisfaction. This arrangement *Treadwell* denies in his answer. It is contended in defence, that the assent of *Treadwell* to the payment to *Carr* cannot be proved by parol, as it would be varying a written contract. Every contract, when reduced to writing, must be proved by the written instrument. It is presumed that the parties incorporate and embody therein all the terms and conditions of their agreement, and with few exceptions, such as fraud and the like, the contract will not be affected by parol proof. But the parties may vary a written contract by a *subsequent* parol agreement. The contracting parties may enlarge the time of payment, or change the mode of payment, or put an end to the contract, and this may be proved by parol. *Keating* v. *Price*, 1 *Johns. Cas.* 22; *Ratcliff* v. *Pemberton*, 1 *Esp. Rep.* 35; *Thresh* v. *Rake*, *ibid*, 53; *Edwin* v. *Saunders*, 1 *Cowen*, 250. In *Fleming* v. *Gilbert*, 3 *Johns.* 528, it was held, that the time of the performance of the condition of a bond may be enlarged by a parol agreement of the parties. *Chitty* says, a subsequent parol agreement not contradicting the terms of the original contract, but merely in continuance thereof, and in dispensation of the performance of its terms, as in prolongation of the time of execution, is good, even in the case of a contract reduced into writing under the statute of frauds. *Chitty on Cont.* 27. A. holds a note against B. who may authorise payment to be made to C., and such payment will be as valid as if made to the promisee himself. The authority to make the payment may be proved by parol as well as the payment itself, and it is not varying or altering the written contract. It is discharg-

ing the contract by payment, and no one will doubt that payment may be proved by parol. We do not say that parol proof of any thing that took place at the time the written contract was entered into, is admissible to vary either the time or mode of payment. If the writing is explicit upon that, it is probably to be considered as the only evidence, but we do hold that the parties may *subsequently* modify the written contract upon those points, and that such modification may be proved by parol. Much reliance is placed by the defendant, on the case of *Brooks* v. *Wheelock*, 11 *Pick.* 439. To us, the point decided in that case appears to be altogether different from the one under consideration. *Wheelock* entered into a contract in writing, to execute and deliver a deed of land upon payment of certain notes given for the purchase money, and made a subsequent *verbal* promise to deliver the deed upon the payment of the notes before they should fall due. Payment of the notes was tendered before they became payable, but the tender was refused, and the notes were not actually paid. The court held the tender of no effect, as the defendant was not bound by his *written* contract to receive payment before the notes fell due. If the payment had been received, the specific performance would, no doubt, have been decreed. The plaintiff *there* was seeking for the performance of a *verbal* agreement. The plaintiff here is seeking for the performance of a *written* agreement, and he proves that he has so performed the condition precedent on his part, as to be entitled to relief; and that whether time be the essence of his contract or not, it has been waived. The contract, which he calls upon the defendant to perform is wholly in writing.

We are referred to *Lord Hardwicke's* observations in *Buckhouse* v. *Crosby, Eq. Cas. Abr.* 32, that an agreement to waive a contract for the purchase of land is as much an agreement concerning lands as the original contract is, and therefore, must, as it seems, be in writing. Without expressing any opinion upon that point, it is a sufficient answer that the waiver here, if any there was, did not relate to the purchase of lands, but to the time of delivery of a quantity of bricks. Those bricks, indeed, formed the consideration of the purchase, but the payment of the consideration may be proved by parol.

The written agreement of the 27th of *March* is explicit and certain, and the inquiry is, has *Low* so performed his part thereof as to entitle him, *in equity*, to demand performance by *Treadwell*. It has been held, that where there is an enlargement of a condition precedent, the plaintiff loses his remedy *at law* upon the covenant itself. Hence the necessity of resorting to equity for relief.

As already stated, *Low* alleges in his bill, that he made payment of the first note to *Carr* by the consent and under an agreement with *Treadwell*. This is denied in the answer, which, being under oath, is to be taken as true, unless overcome by the testimony of two witnesses, or of one witness and circumstances corroborating.

The circumstances bearing upon this point in the case are these ; *Treadwell*, having on the first of *March* purchased the whole lot of *Carr*, for which he was to pay him $300, gave him his note for that amount payable $210 in joiner work, which he was to perform himself, and twenty thousand of good bricks of a quality suitable for the walls of a house, said walls to be eight inches thick, to be delivered at a kiln near *Treadwell's* house, on or before the first of *August*, 1832. On the twenty-seventh of the same *March*, he contracted to sell a part of the lot to *Low* for forty-three thousand of bricks, taking two notes, one for twenty thousand of bricks suitable to build a wall in a house called eight inch wall, to be delivered in *Low's* yard in *Bangor*, which is near *Treadwell's* house, by the first day of *August*, 1832, corresponding precisely with *Treadwell's* note to *Carr*. These are, however, mere circumstances, not amounting to proof of any understanding between *Low* and *Treadwell* that the former should deliver the bricks to *Carr* on account of the latter ; — but they do show that *Treadwell* was under an engagement to deliver to *Carr* the same quantity and description of bricks which he was to have of *Low*, and at the same time. But, upon this point, the case is not destitute of proof. *Carr* says, previous to the time when *Treadwell's* note became due, said *Treadwell* informed him that he was to have the bricks of *Low*, to be delivered at *Low's* brick yard, to pay his note ; that *Low* wished to make an arrangement with him, *Treadwell*, to

wait until the bricks were burned. *Treadwell* informed *Carr* that he had stated to *Low* that if he would make an arrange-ment with *Carr* to extend the time, it would be satisfactory to him. *Carr* says, he had several conversations with *Treadwell,* who uniformly stated that if *Low* paid the bricks to the satisfac-tion of *Carr,* he, *Treadwell,* would be satisfied in regard to the bricks due from *Low* to him ; and that during the time *Low* was delivering the bricks, *Carr* mentioned to *Treadwell* that some of them were not of good quality, who replied, " you must settle that with *Low,* as you have undertaken to receive the bricks from him." *Jason Comings* heard *Treadwell* tell *Low,* the day after the note became payable, that if he would take him off or pay the bricks to *Carr,* he would be satisfied, whereupon *Low* told *Treadwell* that *Carr* had agreed to take the bricks of him, and that he should have got *Treadwell's* note of *Carr* if it had not been given for joiner work also. *Percival* says, that *Treadwell* told him that it was understood by *Low, Carr* and himself, that the bricks due to him from *Low* should go to *Carr.* *Hancock,* who hauled the bricks, says, that previous to the hauling, *Tread-well* informed him that *Carr* had a claim upon him for twenty thousand of bricks, and he had a claim for a similar quantity against *Low,* and that *Carr* was to have the bricks of *Low.* In addition to this, in a cross bill filed by *Treadwell,* he calls upon *Low* to state distinctly, whether he ever received any order, verbal or written, to pay, for him, any bricks to *Carr* ; to which *Low* replies, that *Treadwell* requested him to pay the bricks to *Carr,* and that all he, *Treadwell,* wanted, was, that *Low* should satisfy *Carr.*

With this mass of proof before us we are bound to say, that so much of the respondent's answer as denies that he ever request-ed or consented to have the bricks delivered to *Carr,* and that avers that he never had any notice until between the middle and end of *August,* from any person or any quarter, that *Low* had thought to pay the bricks to *Carr,* or he to receive them, is completely overcome:

It is proved by *Carr,* that he consented to defer the delivery of the bricks for a short time ; — that he did receive twenty thousand of bricks of *Low* on account of the same quantity due

from Treadwell, and that Treadwell did not pay that part of his note to Carr in any other way but by the bricks from Low.

The fact is established by abundant proof, that the prolongation of time was by the mutual consent of all the parties, and Treadwell never, until after the actual delivery of the bricks, made any objections or claimed to rescind the contract. On the contrary he demanded the bricks on the first of August, thereby claiming under the contract, and he told Percival, on the same day, that his object in making the demand of the bricks of Low was to hold him to pay the money, if Carr should call on him for cash, and he stated to Low at the time of making the demand that all he wanted was that Low should satisfy Carr, and he was then informed, that Carr had stated that he had agreed with Treadwell to receive the bricks of Low, and that Carr had agreed with Low to postpone the day of payment, to all which Treadwell made no objection.

We consider the allegation in the bill, so far as it relates to the payment of the first note to Carr by the assent of the respondent, and the prolongation of the time of payment by his assent, also as fully proved.

The second note was to be paid on the sixth of October, 1833. It is admitted that that day was the sabbath.

It is proved by Gowen, that a quantity of bricks, sufficient to pay this note, and of such a quality as is therein described, was on the third and fourth days of October, 1833, counted out and placed by themselves in Low's brick yard for Treadwell, and that the witness was present from sunrise of the fifth of October until after sunset of the same day, ready to deliver said bricks for Low to Treadwell, if he had called for them. The bricks were packed in tiers, and still remain in Low's yard in the place where they were piled on the fifth of October. It is, moreover, proved by Percival and Gowen that, early on the morning of the fifth of October, they left a written notice from Low, at the house of Treadwell, which is within thirty rods of Low's brick yard, informing Treadwell that the bricks were then ready, at said yard, to be delivered to him; and there is proof from Morse and Hardy, that Treadwell was at home on that day. Every thing, which the law requires, was thus done by Low, with the

most scrupulous exactness, to discharge his liability on the second note, and, in our opinion, he entirely accomplished it. He now calls for our interposition to afford him relief. He claims a performance of the contract by *Treadwell,* and invokes the aid of the chancery powers of this Court to enforce the performance.

By statute, *chap.* 50, this Court is clothed with power and authority to hear and determine, in equity, all cases of contract in writing, where the party claims the specific performance of the same, and in which there may not be a plain, adequate and complete remedy at law. Under a similar statute provision, in *Massachusetts,* the Supreme Court of that State, say, " we are satisfied that no subject is more proper for the power of a court of chancery, in decreeing specific execution, than a contract for the sale of real estate, and such contracts are clearly within the chancery powers granted by the legislature to this court. *Ensign* v. *Kellogg,* 4 *Pick.* 5. That court has also determined, that as to those subjects of which it has chancery jurisdiction, their powers will be exercised, according to the same principles of equity, and they will proceed in the same manner as do the courts of a similar jurisdiction in *England. Dwight* v. *Pomeroy,* 17 *Mass.* 303. *Pomeroy* v. *Winship,* 12 *Mass.* 514. In matters of real property, or property which partakes of the realty, equity exercises its authority to put the purchaser in the actual possession of the subject of his purchase, upon the principle that he has a moral right to the observance of the contract, and in equity, that which is agreed to be done, is considered as actually performed.

In cases where the terms of the contract have not been strictly performed on the part of the person seeking specific performance, and consequently an action at law could not be maintained, as performance according to the terms of the contract could not be averred, courts of equity have carried the agreement into execution, where there had been no *laches* imputable to the party seeking the specific performance. But where the party who applies for a specific performance has omitted to execute his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification or excuse for his delay ;— when there is nothing in the acts or conduct of the other party

that amounts to an acquiescence in that delay, the court will not compel a specific performance. It will not permit parties to lie by, with a view to see whether the contract will prove a gaining or losing bargain, and according to the event, either abandon it, or, considering the lapse of time as nothing, claim a specific performance. If, on the other hand, the circumstances of the case and the conduct of the opposite party will afford ground for a just inference, that he has acquiesced in the delay and waived the default, the non-performance at the stipulated time will be overlooked, and will be deemed to have been waived by the other party.

The evidence in this case of a waiver on the part of *Treadwell,* of a strict performance, as to time, in the payment of the first note, and an acquiescence in the delay, is abundant ; and as to the other note, the evidence is equally conclusive that *Low* shew himself ready, desirous, prompt and eager to perform, and has thus placed himself in a favorable position to call for a performance from the other party.

We are urged to consider the great disparity between the consideration paid, and the value of the land claimed, and not to lend our aid to the perfecting of so unequal an arrangement. It is readily admitted that a bill for a specific performance is an application to the sound judicial discretion of the court, which is not to be exercised where the plaintiff has so conducted himself as to destroy all claim to its interposition ; neither is it to be exercised to carry into effect a hard, unreasonable and unequal contract.

It is proved in this case, that the land claimed is now, in *June,* 1835, of the value of *three thousand five hundred* dollars. The sum paid by *Low* was forty-three thousand of bricks, worth four dollars and fifty cents per thousand, equal to one hundred and ninety-three dollars and fifty cents. This shows a most surprising inequality, and which, if it had existed at the time of the contract, would, unexplained, present a stubborn obstacle to any relief from this Court.

But it is the value of the property at the time of entering into the agreement which stamps the character of fairness or unfairness upon the transaction. While it shall not be permitted to the one party to lie by and not perform until he ascertains that the

contract is one of profit and then call for a conveyance, not having seasonably fulfilled on his part, so neither will it be permitted to the other unwarrantably to delay the conveyance, and urge the rise in the value of the property in the mean time, as a valid reason why he should be absolved from his contract. The parties, on entering into the agreement, assume the risk of the fluctuations in the market ; and whether the value of the property, which is the subject of the agreement, be increased or diminished by such fluctuations, the validity of their contract is not thereby to be affected.

Where the equitable title is complete, a legal conveyance will be decreed, though the property may have been much enhanced or depreciated in value. Subsequent events will not, in equity, vary a contract fairly entered into. *Keene* v. *Stukely, Gilb. Eq. Rep.* 155 ; *Revell* v. *Hussey,* 2 *Ball & Beatty,* 287.

By looking at the facts developed, as they existed when the written agreement was entered into, we shall readily ascertain whether there is disclosed, on either side, any thing of hardship or inequality.

The whole of lot numbered two hundred and twenty-one was purchased of *Carr* by *Treadwell,* in *March,* 1832, for three hundred dollars, two hundred and ten dollars of which was to be paid in joiner work, and ninety dollars in bricks. The whole lot was four hundred and twenty-five feet in length, and one hundred and fifty-seven feet in width. In the course of the same month, *Treadwell* sold what was asserted in the argument and not denied to be the *rear,* or back part of the lot to *Low,* for forty-three thousand of bricks, equal in value to one hundred and ninety-three dollars and fifty cents. So that *Treadwell* retained the front, measuring one hundred and fifty-seven by one hundred and seventy-eight feet, at the cost of only one hundred and six dollars and fifty cents. This shows most conclusively how the property was valued at that time, and that *Low* gave *Treadwell* a higher rate for the tract he purchased under the agreement of the twenty-seventh of *March,* than *Treadwell* gave *Carr,* in the same month, for the whole lot. Since that day there has been a most unexampled rise in the value of real estate in *Bangor.* But who is entitled to the benefit of that increase in value of

the tract demanded subsequent to the agreement? Equity considers the estate as belonging to the purchaser from the time he enters into the contract to purchase, and will not equity secure to the owner the rise in the value of his own estate? What if the property had become of less value by reason of the depreciation of real estate; on whom would have been the loss? Would that depreciation have constituted any sufficient defence for *Low* against the payment of his notes? Clearly not.

We have no hesitation in saying, that we see nothing in this contract that has the semblance of hardship, unreasonableness or inequality, having reference to the value of the property on the twenty-seventh of *March*, 1832.

A state of things has arisen since, wholly unexpected, no doubt, by either party, but which can have no retrospective operation upon the validity of existing contracts untinctured with fraud.

We are, therefore, of opinion that the complainant is entitled to have a specific performance by the respondent, of his contract of the twenty-seventh of *March*, 1832, as set out in the bill.

The complainant, having discovered that *Treadwell*, the respondent, had executed a conveyance by deed, of a portion of the premises demanded, to his son *Benjamin Treadwell*, has, in the proper mode, caused the said *Benjamin* to be made a party to this suit, as a confederate with the principal respondent. *Benjamin* admits, in his answer, that he knew of the bargain between his father and *Low*; — that he knew that *Low* commenced building a fence on the land in the spring of 1833, claiming the land and averring that he had paid for it; — that he had heard his father tender the notes to *Low* and demand the bond or agreement of the twenty-seventh of *March*, set out in the bill, and that his father put the notes into his hands to keep until *Low* would give up the contract. In addition to these admissions of *Benjamin* in his answer, it is proved by *Percy*, that in *January*, 1834, he was present when *Low*, *Joseph* and *Benjamin Treadwell* met on the lot of land in dispute. *Low* was having wood hauled on the lot for the purpose of burning bricks the ensuing summer. *Joseph Treadwell* forbid him. *Low* said he had bought the land and paid for it. *Benjamin* said to his father, that he had better let

the wood be carried on, and have the dispute decided by court. Whereupon *Joseph* desisted and *Low* continued to occupy.

Here is abundant evidence that *Benjamin*, at the time he took a deed from his father, in *April*, 1834, had knowledge of *Low's* claim and possession, and consequently his deed cannot be permitted to affect or overreach that claim. If A. purchase, with notice of the claim of B., although B. has not a conveyance, and A. actually procure the estate to be conveyed to him, yet he will be bound in equity by the notice ; for it is a general rule in equity, that a purchaser with notice, is bound to the same extent, and in the same manner as the person was of whom he purchased.

We feel no difficulty in the case arising from the conveyance to *Benjamin*. At the time he took that conveyance, his conscience was affected by a knowledge of *Low's* claim, and he is, therefore, to be considered as a purchaser, subject to *Low's* equity.

We shall, therefore, decree that he release and convey to the plaintiff, in fee, all the right and title derived to him under his deed from *Joseph Treadwell*, of the 7th of *April*, 1834, to that portion of lot numbered two hundred and twenty-one, as delineated on *Treat's* plan, which is described in the contract set forth in the plaintiff's bill, as purchased of *Joseph Treadwell*, on the 27th of *March*, one thousand eight hundred and thirty-two.

*Preble*, for the plaintiff.

*Mellen*, for the defendant.